# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH DIVISION

### Case No. 01-9013-CIV-RYSKAMP/VITUNAC

DELMA LUZ-CARRANZA, et al., )
individually and on behalf of all )
others similarly situated, )
)
     Plaintiffs, )
)
v. )
)
MECCA FARMS, INC., et al., )
)
     Defendants. )
_____ )

## AMENDED PRE-TRIAL STIPULATION

By an order dated April 17, 2002 (Docket Entry 29), the Court directed that this cause would be bifurcated, with the initial phase of the case being limited to whether Defendant Mecca Farms, Inc. "employed" the Plaintiffs within the meaning of the Fair Labor Standards Act ("FLSA") and/or whether Defendant Mecca Farms, Inc., "employed" the Plaintiffs (and the members of the putative class) within the meaning of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA). The "employer status" issue is scheduled to be tried by the Court during the two-week trial period commencing February 10, 2003. (Docket Entry 30). The Parties previously filed separate pre-trial stipulations due to the inability of Mecca Farms, Inc. to file its pre-trial stipulation by January 29, 2003. Pursuant to the Omnibus Order dated February 3, 2003 (Docket Entry 116), Mecca Farms, Inc. was granted leave through February 3, 2003 in which to file its pre-trial stipulation. In an effort to clarify which legal and factual issues the



parties agree upon and which are at issue, the Parties have consolidated their repective pre-trial stipulations into the Amended Pre-Trial Stipulation.  The Parties hereby present their Amended Pre-Trial Stipulation with respect to the "employer status" issue.

I.      **A Short Concise Statement of the Case by Each Party in the Action**.

A. **Plaintiffs**:

The Plaintiffs contend that Defendant Mecca Farms, Inc. suffered or permitted the Plaintiffs and the other members of the putative class to work on the firm's operations during the period encompassed by this litigation, and therefore "employed" these workers within the meaning of the FLSA and the AWPA.  The activities performed by the farmworkers were an integral part of Mecca's overall business.  Mecca controlled the amount of work available to the class members, directed the work assignments, directly and indirectly supervised the work and exclusively had the power to make daily harvest decisions.  Mecca had the power to modify the employment conditions and to determine the pay rates of the farmworkers.  The duration and unskilled nature of the work also indicates an employment relationship between Mecca and the farmworkers.  Mecca also undertook responsibilities ordinarily performed by employers.

B. **Defendant Mecca Farms, Inc.**:

Defendant, Mecca Farms, Inc., contends that the Plaintiffs and other members of the putative class were solely employed by Defendant, M. Sanchez & Son, Inc. and that Mecca Farms, Inc. did not suffer or otherwise permit them to work for Mecca Farms, Inc. as defined by Federal law.  Mecca Farms, Inc. contracted with M. Sanchez & Son, Inc., an independent contractor and properly licensed Farm Labor Contractor, for services which it then performed utilizing individuals employed solely by M. Sanchez & Son, Inc.  Furthermore, the Plaintiffs and other putative class members were not  "economically dependent" on Mecca Farms, Inc. such that Mecca Farms, Inc. "jointly employed" the Plaintiffs or putative class members.  Mecca

Farms, Inc. did not have the ability, actual or implied, to control M. Sanchez & Son, Inc. or its employees in the discharge of their contractual obligations. Any communication between Mecca Farms, Inc. and M. Sanchez & Son, Inc. was for the allowable purposes of a reasonable degree of contract performance oversight, to ensure coordination with third parties, and/or in light of the special considerations of agricultural employment.

### C. Defendants M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez:

M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez have no legal position regarding the joint employer issues.

## II.   The Basis of Federal Jurisdiction.

The Court has jurisdiction pursuant to 29 U.S.C. § 1854(a) (AWPA) and 29 U.S.C. § 216(b) (FLSA).

## III.   The Pleadings Raising the Issues.

This issue is raised in the Amended Complaint for Damages, Declaratory Relief, Injunctive Relief, Costs of Litigation and Attorney's Fee (Docket Entry 18) and Mecca Farms, Inc.'s First Amended Answer and Affirmative Defenses to Plaintiffs' Amended Complaint (Docket Entry 55).

## IV.   A List of all Undisposed of Motions or Other Matters Requiring Action by the Court.

Plaintiffs' Motion for Class Certification  (Docket Entry 38)

Defendant Mecca Farms' Motion for Partial Summary Judgment (Docket Entry 61)

Plaintiffs' Motion for Partial Summary Judgment  (Docket Entry 62)

Defendant Mecca Farms' Motion to Compel Plaintiffs to Respond to the First Set of Interrogatories to the Plaintiffs  (Docket Entry 75)

Defendant Mecca Farms' Motion to Strike Witnesses Not Identified Prior to Close of Discovery (Docket Entry 78)

Plaintiffs' Motion to Renew Motions Adjudicated as Moot by Omnibus Order of December 31, 2002

## V.  A Concise Statement of Uncontested Facts Which Will Require No Proof at Trial, with Reservations, If Any.

1.  Mecca Farms, Inc. is an agricultural grower based in Lantana, Florida that plants, cultivates, and harvests vegetables for commercial sale.

2.  During the years covered by this litigation,[1] Mecca Farms, Inc. contracted with eight farm labor contractors.

3.  During the years covered by this litigation, M. Sanchez & Son, Inc. was a farm labor contractor hired by Mecca Farms, Inc. to plant, cultivate and/or harvest its vegetables.

4.  The Plaintiffs were farmworkers employed as members of M. Sanchez' crews to plant, cultivate, and/or harvest vegetables.

5.  During the years covered by this litigation, Mecca Farms, Inc. leased the Stuart and Anderson farms.

6.  During the years covered by this litigation, M. Sanchez & Son, Inc. crews have worked on Mecca Farms, Inc.'s operations at the Stuart and Anderson farms.

7.  Since 1995, Mecca Farms, Inc. employed Michael Macari as an assistant farm manager to manage the day to day operations on the Stuart and Anderson farms.

8.  Maria Sanchez founded M. Sanchez & Son, Inc. in 1993 and was the president and sole officer of the company.

9.  Roy Rodriguez was a supervisor and oversaw the field operations for M. Sanchez & Son, Inc.

10.  Gustavo Castillo was a M. Sanchez & Son, Inc. field supervisor.  Gustavo Castillo supervised the M. Sanchez & Son, Inc. crews at the Stuart and Anderson farms.

11.  Jorge Flores was a M. Sanchez & Son, Inc. employee who drove workers to the Mecca Farms, Inc. job site on the M. Sanchez & Son company bus.  Jorge Flores was responsible for overseeing the crew he brought on the bus.

12.  During the years covered by this litigation, Mecca Farms, Inc. planted twice as many tomatoes as any other vegetable crop.

---

[1]  The years in question are in dispute and the issue is the subject of Mecca Farms, Inc.'s Motion for Partial Summary Judgment.

13.     There are two vegetable harvests a season on Mecca Farms, Inc.'s operations. The first harvest typically runs from November to January, and the second from March to May.

14.     Mecca Farms, Inc. informed M. Sanchez & Son, Inc. when Mecca Farms, Inc.'s crops were ready to be picked/planted and when there were no longer any crops to be picked/planted.

15.     Mecca Farms, Inc.'s tomatoes were grown on stakes. Workers picked the tomatoes of a specified size and ripeness and placed them in a bucket. When the bucket was full, the worker carried it to a flatbed truck in the field.

16.     Each flat bed truck had one or two M. Sanchez & Son, Inc. workers, known as "dumpers," who dumped the tomatoes in the buckets into the bins on the truck. When the bins on the flat bed truck were full, they were driven to the parking area at the edge of the field where they were loaded by fork lifts on to tractor trailers and taken to the Mecca Farms, Inc. packing house. Mecca Farms, Inc. provided M. Sanchez & Son, Inc. with the bins.

17.     M. Sanchez & Son, Inc. workers received one token for each valid and correct bucket they picked. The persons who gave the pickers the tokens were called "tiqueteros" or tokeners.

18.     For picking tomatoes, Mecca Farms, Inc. paid M. Sanchez & Son, Inc. based on the volume of tomatoes harvested by the M. Sanchez & Son, Inc. workers

19.     For picking tomatoes, M. Sanchez & Son, Inc. workers were paid on a piece-rate basis according to the number of valid and correct buckets they turned in.

20.     M. Sanchez & Son, Inc. provided the workers with the picking buckets.

21.     M. Sanchez & Son, Inc. owned the flatbed trucks and M. Sanchez & Son, Inc. employees drove them.

22.     Tomatoes were not picked when they were wet because they would bruise easily and often became stained or rotten. Tomatoes could be wet in the morning from rain or dew.

23.     Mecca Farms, Inc. informed M. Sanchez & Son, Inc. which fields needed to be picked/planted.

24.     There were times during the season when Mecca Farms, Inc. told M. Sanchez & Son, Inc. not to pick for a period of time.

25.     On the days that M. Sanchez & Son, Inc. picked as many tomatoes as possible, the workday ended later than usual.

26.     In general, Mecca Farms, Inc. received higher prices for First Grade tomatoes than Second Grade tomatoes. The appearance of the tomato, such as defects and color, are factors in determining a tomato's grade. An "unclean" tomato is a tomato that was picked with its stems and leaves. Mecca Farms, Inc. does not want tomatoes with stems and leaves left on

them because the stems and leaves stain the tomatoes.  Mecca receives lowered prices for disfigured tomatoes, such as one that had been stained form the stems and leaves.  If a tomato is picked while too green, it does not mature ("color up") properly.

27.     On occasion, when poor quality produce arrived at the packing house from the Stuart and Anderson farms, Mecca Farms, Inc. informed M. Sanchez & Son, Inc.  Mecca Farms, Inc. informed M. Sanchez & Son, Inc. of such an occurrence on less than half of the occasions that it noted poor quality produce arriving at the packing house from the Stuart and Anderson farms.

28.     Intentionally omitted.

29.     On occasion, Mecca Farms, Inc. informed M. Sanchez & Son, Inc. that under-sized tomatoes were arriving at the packing house or were being placed in the bins.

30.     On occasion, Mike Macari informed M. Sanchez & Son, Inc. that if it was not careful in handling the tomato plants the plants could be broken or damaged.  On those occasions when Mike Macari observed M. Sanchez & Son, Inc. workers not being careful with the plants, he asked that M. Sanchez & Son, Inc. check on the situation.

31.     On occasion, Mike Macari informed M. Sanchez & Son, Inc. that the stems on the tomatoes were to be removed as part of the picking process.

32.     Intentionally omitted.

33.     Intentionally omitted.

34.     After Mike Macari informed Gustavo Castillo that too much "garbage" was being placed in the buckets and/or bins, Gustavo Castillo has told the workers that there was too much "garbage" going inside the buckets or bins.

35.     Depending on the task in laying plastic, the M. Sanchez & Son, Inc. employees were compensated by piece-rate or by the hour.  Planting, staking, pruning were "hourly" tasks, for which workers were paid by the hour.  Pulling the plastics and stakes was also "hourly" work.

36.     Intentionally omitted.

37.     At the beginning of the season, plastic is laid over the tomato beds.  The plastic aids in keeping the fumigant in the ground, controlling the weeds, and preventing disease which can be caused by dirt splashing up onto the tomato plants when there is lots of rain.

38.     Mecca Farms, Inc. owned the machines used for laying the plastic. Mecca Farms, Inc. provided the plastic.

39.     Mecca Farms, Inc. informed M. Sanchez & Son, Inc. each day what fields were ready to have plastic laid.

40.     On those occasions when Mecca Farms, Inc. personnel were in fields where M. Sanchez & Son, Inc. had recently completed laying plastic, Mecca Farms, Inc. checked to ensure that the plastic was being laid correctly and that M. Sanchez & Son, Inc. was doing its job properly.

41.     In planting tomatoes, peppers and eggplant, M. Sanchez & Son, Inc. employees rode the "planting" machine and placed plants in the holes made by the "planting" machine. Other M. Sanchez & Son, Inc. employees walked behind the "planting" machine and made sure that the plants were correctly in the hole and packed the plants into the ground.

42.     Mecca Farms, Inc. delivered the amount of plants needed to plant each day to the planting site.  The plants arrived in boxes.

43.     Mecca Farms, Inc. owned the forklifts used to move the planting boxes.

44.     Mecca Farms, Inc. owned the planting machines.  Mecca Farms, Inc. employees repaired the planting machines when necessary.

45.     Planting machine drivers were usually M. Sanchez & Son, Inc. employees.  When M. Sanchez & Son, Inc. did not have enough planting machine drivers, Mecca Farms, Inc. supplied a Mecca Farms, Inc. employee to serve as a driver.

46.     Mike Macari decided how many "planting" machines would be used for planting each day.

47.     Intentionally omitted.

48.     On those occasions when Mike Macari had an opportunity to review the planting work in fields under his responsibility, Mr. Macari checked to make sure the rows were straight and that every hole had a plant.

49.     Staking is the process of placing stakes into the ground.

50.     Intentionally omitted.

51.     Mecca Farms, Inc. supplied the stakes.

52.     Intentionally omitted.

53.     Mike Macari checked to make sure that M. Sanchez & Son, Inc. was performing staking tasks properly on those occasions when he had an opportunity to review staking work. Sometimes when a stake was not standing straight or was broken, Mike Macari spoke to an M. Sanchez & Son, Inc. supervisor.  After Mike Macari spoke to the supervisors about stakes not standing straight or being broken, the M. Sanchez & Son, Inc. supervisors told the workers to correct the work.

54.     On those occasions that Mike Macari had an opportunity to review staking work, he checked the staking work to make sure that the stakes were placed in the ground straight and

at the correct height.  Gustavo Castillo consulted with Mike Macari if the stakes were placed wrong to determine if Mecca Farms, Inc. wanted M. Sanchez & Son, Inc to correct the stakes or leave them as is.

55.    To prevent the tomato plant from falling down as it grew, the plants were tied to the stakes with string. Each plant was usually tied three times.

56.    Mecca Farms, Inc. provided the string that M. Sanchez & Son, Inc. workers used for tying the plants.

57.    Mecca Farms, Inc. paid M. Sanchez & Son, Inc. on a piece-rate (per linear feet) basis for the tying work.

58.    Intentionally omitted.

59.    Mecca Farms, Inc. informed M. Sanchez & Son, Inc. each day which fields were ready to be tied.

60.    On those occasions where Mike Macari had an opportunity to review the tying work, he would check that the string was tight enough to hold up the plant as well as other things.  If the string had not been tied properly, Mike Macari informed M. Sanchez & Son, Inc. of the problem.  After Mr. Macari informed M. Sanchez & Son, Inc. of problems with the tying work, M. Sanchez & Son, Inc. typically informed its crews of how to tie the plants properly.

61.    Intentionally omitted.

62.    Intentionally omitted.

63.    Pruning is the process of removing the excess foliage from the plants.  Pruning and suckering describe the same activity.

64.    Pruned plants ordinarily yielded bigger tomatoes.

65.    Intentionally omitted.

66.    On occasion, Mike Macari checked that M. Sanchez & Son, Inc. was doing the pruning work well.

67.    If workers stepped on the plastic it could be stretched or holes or indentations could be made.  Holes in the plastic covering the beds could cause the fertilizer to leach out.  On occasion, Mike Macari informed M. Sanchez & Son, Inc. that its workers had made holes or indentations on the plastic.  After informing M. Sanchez & Son, Inc. about the holes or indentations in the plastic, Mike Macari expected M. Sanchez & Son, Inc. to correct the problem. Such a discussion occurs less than once or twice a year.  Mike Macari has told M. Sanchez & Son, Inc. that its workers should not step on the plastic.

68.     After Mike Macari has informed M. Sanchez & Son, Inc. that he has observed improper pruning work, M Sanchez & Son, Inc. supervisors have gone to individual workers to make sure they know how to do it correctly.

69.     Intentionally omitted.

70.     After the harvest, the string is cut, the stakes are collected, and the plastic and plants are removed from the ground and later burned.

71.     Intentionally omitted.

72.     Depending on the task, M. Sanchez & Son, Inc. employees were paid by the hour or on a piece-rate basis.

73.     A Contractor Field Invoice form was used by M. Sanchez & Son, Inc. to record data during the hourly work. These Contractor Field Invoices were used by Mecca Farms, Inc. to calculate the amount owed to M. Sanchez & Son, Inc. for "hourly" work pursuant to their contract.

74.     Mecca Farms, Inc. provided the Contractor Field Invoices to M. Sanchez & Son, Inc. M. Sanchez & Son, Inc. supervisors filled out the Contractor Field Invoices. M. Sanchez & Son, Inc. handed in the completed Contractor Field Invoices to Mike Macari every day for work compensated on an hourly basis. Mike Macari approved the Contractor Field Invoice by signing it every day for the work compensated on an hourly basis. When Mike Macari approved and signed off on the Contractor Field Invoices for the hourly work, he also verified the workers' starting time but only on the occasions that he actually witnessed the crew starting.

75.     Intentionally omitted.

76.     M. Sanchez & Son, Inc. used the 3-Three Row Plastic Laying Form to determine how much to pay each hourly employee. Mike Macari reviewed and signed the 3-Row Plastic Laying Form.

77.     Intentionally omitted.

78.     Intentionally omitted.

79.     Before January 2000, Mecca Farms, Inc. paid the employer's share of the social security (FICA) taxes on "hourly" work to M. Sanchez & Son, Inc. by issuing a check payable to its bank.

80.     Intentionally omitted.

81.     After learning that M. Sanchez & Son, Inc. paid its workers in cash instead of with a check, Mecca Farms, Inc. told it to discontinue the practice. M. Sanchez & Son, Inc. discontinued its practice of paying the workers in cash after Mecca Farms, Inc. told it to cease the practice.

82.     Mecca Farms, Inc. issued M. Sanchez & Son, Inc. a memo telling it to be sure that its workers received the federally required pesticide safety training.

83.     Mecca Farms, Inc. was an additional insured party on M. Sanchez & Son, Inc.'s worker's compensation, general liability, and automobile insurance policies.

84.     After the bins were transported to Mecca Farms, Inc.'s packing house, the produce was sorted and packaged for sale.  Within a short time after being packed, the produce is delivered to an independent third party shipper for delivery to the purchaser.

85.     Intentionally omitted.

## VI.    A Statement in Reasonable Detail of Issues of Fact Which Remain to be Litigated At Trial.

1.     Whether Mecca Farms, Inc. instructed or directed M. Sanchez & Son, Inc. as to the number of workers it should furnish each day.

2.     Whether Mecca Farms, Inc. determined the wage rates to be paid employees of M. Sanchez & Son, Inc. for work performed on an hourly basis.

3.     Whether Mecca Farms, Inc. had the power to determine the starting time of employees of M. Sanchez & Son, Inc. for work performed on the operations of Mecca Farms, Inc.

4.     Whether Mecca Farms, Inc. had the power to determine the number of workers M. Sanchez & Son, Inc. furnished for certain activities.

5.     Whether Mecca Farms, Inc. had the right or power to supervise the work of M. Sanchez & Son, Inc. employees.

6.     Whether Mecca Farms, Inc. supervised, directly or indirectly, the work of M. Sanchez & Son, Inc. employees.

7.     Whether Mecca Farms, Inc. had the power to assign M. Sanchez & Son, Inc. employees to certain tasks.

8.     Whether Mecca Farms, Inc. had the power to determine the stopping time of the M. Sanchez & Son, Inc. labor crew.

9.     Whether Mecca Farms, Inc. had the power to direct M. Sanchez & Son, Inc. as to the means by which it should transport its employees to Mecca Farms, Inc.'s jobsite.

10.    Whether Mecca Farms, Inc. had the power to direct, either directly or through a M. Sanchez & Son, Inc. supervisor, how M. Sanchez & Son, Inc. employees performed their job.

11.    Whether Mecca Farms, Inc. had the power to determine whether M. Sanchez & Son, Inc. re-staked a field.

12.     Whether Mecca Farms, Inc. determined the location where M. Sanchez & Son, Inc. employees were assigned each day.

13.     Whether Mecca Farms, Inc. had the power to adjust or alter the wage scales paid by M. Sanchez & Son, Inc. to its employees for work performed on an hourly basis.

14.     Whether Mecca Farms, Inc. provided field toilets, water jugs, picking tokens, buckets and other items to employees of M. Sanchez & Son, Inc.

15.     Whether M. Sanchez & Son, Inc. worked exclusively for Mecca Farms, Inc. during the years covered by this litigation.

16.     Whether the work performed by the M. Sanchez & Son, Inc. employees was unskilled and rote in nature.

17.     Whether the activities performed by M. Sanchez & Son, Inc. employees were an integral part of the overall business of Mecca Farms, Inc.

18.     Whether the Plaintiffs were "economically dependent" on M. Sanchez & Son, Inc.

19.     Whether the Plaintiffs were "economically dependent" on Mecca Farms, Inc.

20.     Whether the communications between Mecca Farms, Inc. and M. Sanchez & Son, Inc. were for the purpose of a reasonable degree of contract performance oversight.

21.     Whether the communications between Mecca Farms, Inc. and M. Sanchez & Son, Inc. were for the purpose of ensuring coordination with third parties.

22.     Whether the communications between Mecca Farms, Inc. and M. Sanchez & Son, Inc. occurred due to the special considerations of agricultural employment.

**VII.   A Concise Statement of Issues of Law on Which There is Agreement**.

Mecca Farms, Inc. is subject to the Fair Labor Standards Act.

**VIII.   A Concise Statement of Issues of Law Which Remain for Determination by the Court**.

Whether Mecca Farms, Inc. "employed" the Plaintiffs and the other members of the M. Sanchez & Son, Inc. crew while they worked on the operations of Mecca Farms, Inc.

## IX. Each Party's Numbered List of Trial Exhibits, other than Impeachment Exhibits, Including the Basis of all Objections to Each Document.

### A. Plaintiffs' Trial Exhibit List

See Exhibit "A," attached hereto, for Mecca Farms, Inc.'s objections to Plaintiffs' Trial Exhibit List.

### B. Mecca Farms, Inc.'s Trial Exhibit List

1. Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc. dated July 24, 1997. (Subject to Mecca Farms, Inc.'s argument on the statute of limitations and corresponding relevance and materiality objections.)

2. Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc. dated August 5, 1998. (Subject to Mecca Farms, Inc.'s argument on the statute of limitations and corresponding relevance and materiality objections.)

3. Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc. dated January 14, 2000.

4. Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc. dated July 31, 2000.

5. Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc. dated July 31, 2001.

6. Transcript of deposition of Jose Gustavo Castillo, August 2, 2002.

7. Transcript of deposition of Jorge Flores, August 5, 2002.

8. Transcript of deposition of Rafael Gonzalez-Vasquez, September 22, 2002.

9. Transcript of deposition of David Matias, February 4, 2002.

10. Transcript of deposition of Virginia Perez-Abad, July 30, 2002.

11. Transcript of deposition of Adolfo Perez, July 19, 2002.

12. Transcript of deposition of Delma Luz Carranza, July 23, 2002.

13. Transcript of deposition of Francilia Hernandez Perez, August 1, 2002.

14. Transcript of deposition of Rogerio "Roy" Rodriguez, August 7, 2002.

15. Transcript of deposition of Maria T. Sanchez, June 11, 2002 and June 20, 2002.

16. Transcript of deposition of Carlos Rodrigo Ramos-Perez, October 4, 2002.

16.     Transcript of deposition of Gloria Roblero Perez, July 26, 2002.

C.     **Trial Exhibit List for M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez**

M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez have no trial exhibits to be listed other than those identified by the other parties.

X.     **Each Party's Numbered List of Trial Witnesses, with Their Addresses, Separately Identifying Those Whom the Party Expects to Present and Those Whom the Party May Call if the Need Arises. Witnesses Whose Testimony is Expected to be Offered by Means of a Deposition shall be so Designated. Impeachment Witnesses Need Not Be Listed. Expert Witnesses Shall be so Designated.**

A.  **Plaintiffs' Witnesses**

1.  **Witnesses expected to be called**

a)     Jose Gustavo Castillo
Post Office Box 1694
Indiantown, Florida  34956\

b)     Jorge Flores
17564 Lincoln Street
Indiantown, Florida  34956

c)     Rafael Gonzalez-Vasquez (testimony to be offered through deposition)
Aldea Las Majadas
Tacana, San Marcos
Guatemala

d)     Eila Granfors
2856 S. Garden Drive
Lake Worth, Florida  33461

e)     Francilia Hernandez Perez
14753-169th Avenue
Indiantown, Florida  34956

f)     Delma Luz Carranza
Post Office Box 556
Indiantown, Florida  34956

g)     Michael Daniel Macari
708 North River Drive
Stuart, Florida  34995

h)    David Matias (testimony to be offered through deposition)
Aldea Canival
Quilco, Guatemala

i)    Adolfo Perez
14906 Indianmound Street
Indiantown, Florida  34956

j)    Virginia Perez-Abad
14507 Tumani, Box #18
Indiantown, Florida  34957

k)    Gloria Roblero-Perez (testimony to be offered through deposition)
Villa Nueva
Tacana, San Marcos
Guatemala

l)    Carlos Rodrigo Ramos-Perez (testimony to be offered through deposition)
4826 N. Springfield
Chicago, Illinois  60625

m)    Rogerio "Roy" Rodriguez
9276 Lakeside Lane
Boynton Beach, Florida  33437

n)    Maria T. Sanchez
9276 Lakeside Lane
Boynton Beach, Florida  33437

o)    Mark Sander Shaw
c/o Mecca Farms, Inc.
7965 Lantana Road
Lake Worth, Florida  33467

p)    Thomas James Mecca
c/o Mecca Farms, Inc.
7965 Lantana Road
Lake Worth, Florida  33467

q)    Lori Mecca Schwab
4582 Hunting Trail
Lake Worth, Florida  33467

r)      Gary Smigiel
        1020 S. Lakeside Drive
        Lake Worth, Florida

## B. **Mecca Farms, Inc.'s Witnesses**

### 1. **Witnesses Mecca Farms, Inc. Expects to Call**:

a)      Tommy Mecca
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

b)      Gary Smigiel
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

c)      Lori Schwab
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

d)      Mark Shaw
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

e)      Michael Macari
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

f)      Rafael Gonzalez-Vasquez (testimony to be offered through deposition)
        Aldea Las Majadas
        Tacana, San Marcos
        Guatemala

g)      Francilia Hernandez Perez
        14753-169th Avenue
        Indiantown, Florida  34956

h)      Delma Luz Carranza
        Post Office Box 556
        Indiantown, Florida  34956

i)      David Matias (testimony to be offered through deposition)
        Aldea Canival
        Quilco, Guatemala

j)      Adolfo Perez
        14906 Indianmound Street
        Indiantown, Florida  34956

k)      Virginia Perez-Abad
        14507 Tumani, Box #18
        Indiantown, Florida  34957

l)      Gloria Roblero-Perez (testimony to be offered through deposition)
        Villa Nueva
        Tacana, San Marcos
        Guatemala

m)      Carlos Rodrigo Ramos-Perez (testimony to be offered through deposition)
        4826 N. Springfield
        Chicago, Illinois  60625

n)      Rogerio "Roy" Rodriguez
        9276 Lakeside Lane
        Boynton Beach, Florida  33437

**2.      Witnesses Mecca Farms, Inc. May Call:**

a)      Mark Mecca
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

b)      Joseph Schwab
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

c)      Eric Schwab
        Mecca Farms, Inc.
        7965 Lantana Road
        Lake Worth, Florida  33467

d)      Jose Gustavo Castillo
        Post Office Box 1694
        Indiantown, Florida  34956

    e)       Jorge Flores
               17564 Lincoln Street
               Indiantown, Florida  34956

    f)       Maria T. Sanchez
               9276 Lakeside Lane
               Boynton Beach, Florida  33437

### C. Witnesses for M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez

M. Sanchez & Son, Inc., Maria T. Sanchez and Rogerio T. Rodriguez have no witnesses

to be named other than those identified by the other parties.

### XI.  Estimated Trial Time.

Three to four days.

### XII.  Where Attorney's Fees May Be Awarded to the Prevailing Party, an Estimate of Each Party as to the Maximum Amount Properly Allowable.

Because this cause has been bifurcated, no attorney's fees will be sought by the Plaintiffs

until the entire case has been tried.  If they prevail, the Plaintiffs will seek fees under the Fair

Labor Standards Act, 29 U.S.C. § 216(b), and Florida Statutes § 448.08.

Respectfully submitted,

Gregory S. Schell
Florida Bar Number 287199
Cathleen D. Caron
Florida Bar Number 0468266
Migrant Farmworker Justice Project
508 Lucerne Avenue
Lake Worth, FL  33460
Telephone:  (561) 582-3921
Facsimile:  (561) 582-4884
E-mail:  greg@floridalegal.org
E-mail:  cathleen@flroidalegal.org

Attorneys for Plaintiffs

CARLTON FIELDS, P.A.
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL 33401-6149
Telephone:(561) 659-7070
Facsimile: (561) 659-7368


By:_____
    Joseph Ianno, Jr.
    Florida Bar No. 655351
    *e-mail: jianno@carltonfields.com*

    Henry S. Wulf, Esq.
    Florida Bar Number 0056049
    *e-mail: hwulf@carltonfields.com*

    Attorneys for Mecca Farms, Inc.


_____
Don R. Boswell
Florida Bar Number 145894
Akers & Boswell, P.A.
2875 South Ocean Boulevard, Suite 200
Palm Beach, FL  33480
Telephone:  (561) 547-6300
Facsimile:  (561) 547-3955

Attorney for Defendants M. Sanchez & Son,
Inc., Maria T. Sanchez, and Rogerio T.
Rodriguez

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the Pre-Trial Stipulation of Defendant, Mecca Farms, Inc. was served via facsimile and U.S. Mail this 21st day of February, 2003 to **Cathleen D. Caron, Esq.,** counsel for Plaintiffs, Migrant Farmworkers Justice Project, 508 Lucerne Avenue, Lake Worth, Florida 33460; and by U.S. Mail only to **Don R. Boswell, Esq.,** Counsel for Co-Defendants, Akers & Boswell, P.A., 2875 South Ocean Boulevard, Suite 200, Palm Beach, Florida 33480.

ATTORNEY

**EXHIBIT "A"**

**DEFENDANT, MECCA FARMS, INC.'S
OBJECTIONS TO PLANTIFFS' TRIAL EXHIBITS**

**Key to objections**:  (N)  No objections
(R)   Relevancy
(M)   Materiality
(A)   Authenticity
(H)   Hearsay
(UP)  Unduly prejudicial/probative value outweighed by undue prejudice
(P)   Privileged
(F)   Form objections
(C)   Capacity
(A)   All objections

| NO. | EXHIBIT | OBJECTION |
|---|---|---|
| 1. | Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc., dated July 1, 1996 | R M |
| 2. | Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc., dated July 24, 1997 | R M |
| 3. | Contract between Mecca Farms Inc. and M. Sanchez & Son, Inc., dated August 5, 1998 | R M |
| 4. | Contract between Mecca Farms, Inc. and M. Sanchez & Son, Inc., dated July 31, 2001 | N |
| 5. | Mecca Farms, Inc. ledger of payments to M. Sanchez & Son, Inc., including amounts due for unemployment compensation and worker's compensation premiums | R M A UP |
| 6. | Payment records relating to M. Sanchez & Son, Inc., including contractor field invoices and 3-Row Plastic Laying Forms (Mecca Bates stamp numbers 11697-11723) | R M |
| 7. | Bill from Mecca Farms, Inc. to M. Sanchez & Son, Inc. for purchase of picking tokens (Mecca Bates number 08542) | R M |
| 8. | Memorandum from Mark Shaw to Lori Schwab re purchase of machetes for M. Sanchez & Son, Inc., dated December 1, 1997 (Mecca Bates number 05837) | R M |
| 9. | Promissory note from Maria Sanchez to Mecca Farms, Inc., dated | R M |

| NO. | EXHIBIT | OBJECTION |
|-----|---------|-----------|
| | August 8, 1997 (Mecca Bates number 04768) | |
| 10. | Promissory note from Maria Sanchez to Mecca Farms, Inc. dated September 5, 1997 (Mecca Bates number 04769) | R M |
| 11. | Mecca Farms. Inc. check 016981 to Roy Rodriguez, dated November 4, 1998, with accompanying notes (Mecca Bates number 09640) | R M |
| 12. | Mecca Farms, Inc. Ledger reflecting loans to and payments from M. Sanchez & Son, Inc. (Mecca Bates numbers 04766 and 04767) | R M |
| 13. | Accounting sheet reflecting Nextel bills chargeable to M. Sanchez & Son, Inc. (Mecca Bates number 09541) | R M |
| 14. | Invoice from Smitty's Alternator Repair Inc., dated October 22, 1998, with accompanying notations (Mecca Bates number 09543) | R M |
| 15. | Invoice from Country Auto Parts to Mecca Farms, Inc., dated October 28, 1998, with accompanying notations (Mecca Bates number 09587) | R M |
| 16. | Invoice from Windmill Sprinkler & Hardware to Mecca Farms, dated October 12, 1998, with accompanying notations (Mecca Bates number 09591) | R M |
| 17. | Invoice from Windmill Sprinkler & Hardware to Mecca Farms, dated October 30, 1999, with accompanying notations (Mecca Bates number 11701) | R M |
| 18. | Invoices from Auto Supply of Stuart, Inc. to Mecca Farms, Inc., dated September 2 and September 4, 1997, with accompanying notations (Mecca Bates number 06145) | R M |
| 19. | Invoice to Mecca Farms, Inc. from Marc Industries, dated November 3, 1999, with accompanying notations (Mecca Bates number 11700) | R M |
| 20. | Invoice to Mecca Farms, Inc. from Industrial Supplies Company for six 10-gallon coolers, dated January 30, 1997, with accompanying notations (Mecca Bates number 02908) | R M |
| 21. | Invoice to Mecca Farms, Inc. from A-1 Little John, dated January 31, 1997, with accompanying notations (Mecca Bates number 02913) | R M |

| NO. | EXHIBIT | OBJECTION |
|-----|---------|-----------|
| 22. | Invoices to Mecca Farms from Intergro, Inc. for picking buckets, dated December 26, 1996, with accompanying notations (Mecca Rates numbers 03081 and 03082) | R M |
| 23. | Contractor Field Invoice from M. Sanchez & Son, Inc., January 4, 2000 | R M A |
| 24. | Contractor Field Invoice from M. Sanchez & Son, Inc., January 4, 2000, with computations and notations by Mecca Farms, Inc. clerical staff (Mecca Bates number 11645) | R M |
| 25. | Contractor Field Invoice from M. Sanchez & Son, Inc., October 2, 1997 | R M A |
| 26. | Contractor Field Invoice from M. Sanchez & Son Inc., November 6, 1998 (Mecca Bates number 09607) | R M |
| 27. | Contractor Field Invoice from M. Sanchez & Son, Inc., November 3, 1999 (Mecca Bates number 11914) | R M |
| 28. | Contractor Field Invoice from M. Sanchez & Son, Inc., November 4, 1999 (Mecca Bates number 11913) | R M |
| 29. | Contractor Field Invoice from M. Sanchez & Son, Inc., November 4, 2000 (Mecca Bates number 10658) | R M |
| 30. | Contractor Field Invoice from M. Sanchez & Son, Inc., January 16, 2001 (Mecca Bates number 14308) | R M |
| 31. | Contractor Field Invoice from M. Sanchez &Son, Inc., February 9, 2001 (Mecca Bates number 14133) | R M |
| 32. | Summary sheet for tying work, January 17, 1997 (Mecca Bates number 03041) | R M |
| 33. | Time cards for Enrique Cavazos and Jesus Cavazos, October 7, 1997 (Mecca Bates number 06154) | R M |
| 34. | Ledger sheet showing "savings" for M. Sanchez & Son Inc. (Mecca Bates number 17933) | R M |
| 35. | Memorandum from Mark Shaw to Crewleaders/Farm Managers, dated January 26, 1999 | R M A UP |

| NO. | EXHIBIT | OBJECTION |
|---|---|---|
| 36. | Memorandum from Mark Shaw to Crewleaders regarding WPS Training:  Worker Protection Standards, dated July 17, 2000 | R M A UP |
| 37. | Fax transmittal to Maria Sanchez from Mark Shaw dated April 4, 2002, with attached notes labeled "4/3/02 Stuart Van Inspection" | R M A UP |
| 38. | Memorandum from Gary Smigiel to All Crewleaders regarding "Regulations," dated May 17, 2002 | R M A UP |
| 39. | Form 1099-MISC for 2000 issued to M. Sanchez & Son, Inc. by Mecca Farms, Inc. | R M A |
| 40. | M. Sanchez & Son, Inc. vehicle insurance policy from 1997-98 season, listing Mecca Farms, Inc. as a certificate holder | R M A UP |
| 41. | Transcript of deposition of Jose Gustavo Castillo August 2, 2002 | R M F C |
| 42. | Transcript of deposition of Jorge Flores, August 5, 2002 | R M F C |
| 43. | Transcript of deposition of Rafael Gonzalez-Vasquez, September 22, 2002 | R M F C |
| 44. | Transcript of deposition of Eila Granfors, August 12, 2002 | R M F |
| 45. | Transcript of deposition of David Matias, February 4, 2002 | R M F C |
| 46. | Transcript of deposition of Michael D. Macari, August 14, 2002 | R M F |
| 47. | Transcript of deposition of Virginia Perez-Abad, July 30, 2002 | R M F C |
| 48. | Transcript of deposition of Carlos Rodrigo Ramos-Perez, October 4, 2002 | R M F C |
| 49. | Transcript of deposition of Gloria Roblero Perez, July 26, 2002 | R M F C |
| 50. | Transcript of deposition of Mark Shaw, August 14, 2002 | R M F |